**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Manuel Navarro-Cabrera, individually and on behalf of all others similarly situated,<br><br>                  Plaintiff,<br><br>v.<br><br>QVC, Inc.,<br><br>                  Defendant. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Manuel Navarro-Cabrera ("Plaintiff") brings this action on behalf of herself and all others similarly situated against QVC, Inc. ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

**NATURE OF THE ACTION**

1.     Defendant QVC, Inc., ("QVC") operates a prominent television shopping network, with a presence both online and on television. Defendant owns and operates its online and mobile applications ("Apps"), including www.qvc.com (the "Website"). Through its Website and Apps, Defendant sells audiovisual materials, such as video games and movie DVDs. Additionally, QVC offers, through its Website and Apps, a massive library of prerecorded videos showcasing its various products.

2.     Unbeknownst to Plaintiff and the Class Members, Defendant knowingly and intentionally discloses its users' personally identifiable information—including a record of every video viewed by the user or audiovisual content purchased —to unauthorized third parties without

first complying with the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiff's claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class Members; (2) the combined claims of Class Members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in different states.

4. This Court has general jurisdiction over Defendant because Defendant maintains its principal place of business within this District.

5. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because Defendant resides in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

## PARTIES

6. Plaintiff Navarro-Cabrera is a citizen of California, who resides in Anaheim, California. Plaintiff Navarro-Cabrera has had an account with QVC which he has used to purchase a video game and watch prerecorded video content from his computer on a regular basis within the last two years since the filing of this Complaint.

7. Throughout the duration of his interactions with Defendant's Website, Plaintiff Navarro-Cabrera has maintained and used his Facebook account from the same browser that he used to request and view Defendant's video content on the Website. Plaintiff Navarro-Cabrera also has a Tiktok account.

1

8. Pursuant to the systematic process described herein, Defendant caused Plaintiff Navarro-Cabrera's video consumption to be sent along with his personally identifiable information ("PII") to Facebook and TikTok without his knowledge or consent each time he requested and viewed video content through the Website.

9. Plaintiff Navarro-Cabrera never consented, agreed, nor otherwise permitted Defendant to disclose his PII and viewing information to third parties and certainly did not do so for purposes violative of the VPPA.

10. Defendant QVC, Inc. is a Pennsylvania corporation with its principal place of business located in West Chester, Pennsylvania.

## GENERAL ALLEGATIONS

*History and Overview of the VPPA*

11. The impetus for the VPPA began with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> "It is nobody's business what Oliver North or Pratik Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong".

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

12. In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's

2

applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

13. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

*Defendant is a Video Tape Service Provider*

14. Defendant sells prerecorded audiovisual materials in the form of DVDs and video games.

15. Additionally, Defendant, through its Website and Apps, offers a vast library of prerecorded audiovisual content, including demonstration videos with presenters showcasing various products.

16. Individuals may develop a subscriber relationship with Defendant by creating an account or signing up for Defendant's promotional newsletter, which requires providing one's email.

*Defendant Knowingly Discloses Consumers' PII To Third Parties*

17. When subscribers request or view videos on Defendant's Website and Apps or purchase a video game or DVD, their Personal Viewing Information is transmitted to Facebook, TikTok, and other unauthorized third parties through tracking tools that Defendant purposely

3

installed and implemented on its Website and Apps. Defendant controlled its Website, Apps, and all of the tracking technologies that it used to transmit its subscribers' Personal Viewing Information to unauthorized parties. Importantly, Facebook and TikTok would not have received Plaintiff's or the Class Members' Personal Viewing Information but for Defendant's decision to install and use Facebook's Business Tools, including the Facebook Pixel and Conversions API,[1] TikTok Pixel, and other tracking technologies on its Website and Apps.

18. Moreover, Defendant controlled which data was tracked, recorded, and transmitted when its subscribers requested or viewed its video content.

19. Defendant's knowledge as to its conduct is evidenced by the fact that: (1) it chose to track its subscribers' interactions with the Website and Apps, including their requests to view shows or movies; (2) it requested and installed lines of code that achieved this purpose; (3) it obtained the lines of code from Facebook, TikTok and other third parties in order to achieve this purpose; and (4) it controlled the information that was tracked, recorded, and transmitted via the Website and the Apps.

*Defendant's use of Facebook and TikTok Business Tools and Tracking Pixels*

20. Facebook is a real identity platform, meaning that users are allowed only one account and must share the name they go by in everyday life. To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

21. Businesses, such as Defendant, use Facebook's Business Tools to monitor and record their website and app visitors' devices and specific activities for marketing purposes.

22. More specifically, the Facebook pixel that Defendant installed and used tracked,

---

[1] Notably, the Facebook Pixel works in conjunction with its Conversion API tool and, as a result, Defendant transmits one copy of its digital subscribers' viewing information directly from its web server to Meta's web servers. Additional copies of this information are also communicated through the use of cookies.

recorded, and sent Facebook its subscribers' granular Website and Apps activity, including the names of specific videos that subscribers requested and/or viewed each time through Defendant's Website and Apps. The information is not merely metadata.

23. Defendant's motivation for using the Facebook Pixel and related Facebook Business Tools is simple—it financially benefits Defendant through advertising and information services that Defendant would otherwise have to pay for.

24. The information Facebook receives from Defendant identifies subscribers based on their unique and persistent Facebook IDs ("FID"), which is sent to Facebook as one data point alongside the title of the video content the specific subscriber requested or viewed.

25. Notably, these marketing tools are not required for the Defendant's Website or Apps to function properly. Even if it finds the tools helpful, it could have used them in a manner that does not reveal its subscribers' Personal Viewing Information.

26. Any ordinary person who comes into possession of a Facebook ID can easily use that information to identify a particular individual and their corresponding Facebook profile, which contains additional information such as the user's name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts. This information may reveal even more sensitive personal information—for instance, posted photos may disclose the identity of family members, and written posts may disclose religious preferences, political affiliations, personal interests, and more.

27. Defendant also uses TikTok's Pixels and persistent cookies "application programming interfaces" ("APIs") on its Website and Apps. TikTok, owned by Chinese parent company ByteDance Ltd., launched in 2017 and is headquartered in both Los Angeles, CA and

5

Singapore. TikTok represents that it is "the leading destination for short-form mobile video[.]"[2] The company's app has over one billion users and monetizes its data for advertising purposes—its main source of revenue.[3] Last year, TikTok's revenue totaled $16 billion in the United States alone.[4]

28.     In addition to its social media offerings, TikTok develops several analytics tools for use by web and app developers. TikTok allows web and app developers to incorporate its analytics tools into their platforms free of charge for the purposes of gaining customer insights, measuring customer interactions, and optimizing marketing performance. In exchange for the free use of its tools, TikTok automatically receives user data associated with its embedded business tools. Like Facebook, the information TikTok receives from Defendant identifies subscribers based on their unique and persistent TikTok identifiers, which is sent to TikTok as one data point alongside the title of the video content the specific subscriber requested or viewed.

29.     At a minimum, both Facebook and TikTok received Plaintiff's Personal Viewing Information as a result of Defendant's data-sharing practices and the tools it installed on its Website and Apps.

***Defendant's Use of Tracking Tools***

30.     When Defendant's subscribers purchase, request or view audiovisual content on

---

[2] *About TikTok*, TIKTOK, https://www.tiktok.com/about?lang=en (last accessed November 14, 2024).

[3] Mansoor Iqbal, *TikTok Revenue and Usage Statistics (2024)*, BUSINESS OF APPS (July 8, 2024), https://www.businessofapps.com/data/tik-tok-statistics/; see also NewFronts '24: Introducing New Premium Ad Solutions for Marketers, TIKTOK COMMUNITY (May 2, 2024), https://newsroom.tiktok.com/en-us/newfronts-24-introducing-new-premium-ad-solutions-for-marketers; Zheping Huang, *TikTok Has a Few Main Ingredients for Making Money*, BLOOMBERG (June 28, 2022), https://www.bloomberg.com/news/newsletters/2022-06-28/how-does-tiktok make-money-app-relies-on-a-few-main-ingredients.

[4] *TikTok's US Revenue Hits $16 bln as Washington Threatens Ban, FT Reports*, REUTERS (Mar. 15, 2024), https://www.reuters.com/technology/tiktoks-us-revenue-hits-16-bln-washington-threatens-ban-ft-reports-2024-03-15/ (last accessed November 14, 2024).

Defendant's Website, the specific title of the video or video game is transmitted to Facebook and TikTok alongside the subscribers' persistent and unique Facebook and TikTok's identifiers, thereby revealing their Personal Viewing Information to Facebook and Tiktok.

31. However, subscribers are unaware of this because, amongst other things, Defendant's transmissions are completely invisible to ordinary subscribers' viewing Defendant's webpages. Figures 2 and 3 are an attempt at lifting the curtain to show precisely what happens behind the scenes when Plaintiff and the Class Members request or view video content on Defendant's Website.

32. While Figure 1 shows what ordinary subscribers see on their screens as they use the Website, Figures 2-3 show the invisible, behind-the-scenes transmissions taking place.



*Figure 1. The image above is a screenshot of what a consumer sees when they attempt to purchase a video game on Defendant's Website. The page does not contain any logos or indications that their interactions are recorded and sent to Facebook or TikTok.*

7

33. The information contained in Figures 2 and 3 shows that Defendant sends Facebook and TikTok the exact user and the title of the video content they requested or viewed on the Website. By default, the videos on Defendant's Website are set to autoplay.



*Figure 2. The images above represent a screenshot of a network traffic report that was taken when a subscriber attempted to purchase a video game from Defendant's Website, at which time the personal viewing information was transmitted to Facebook*

**[Intentionally Left Blank]**

8



*Figure 3. The image above represents a screenshot of a network traffic report that was taken when a subscriber attempted to purchase a video game on Defendant's Website, at which time the personal viewing information was transmitted to TikTok.*

34. Upon information and belief, Defendant also transmits its subscribers' Personal Viewing Information to Facebook, TikTok, and additional unauthorized third parties – including Google and Twitter – through other tracking technologies installed on its Website and Apps.

35. The Personal Viewing Information that Defendant obtained from Plaintiff and the Class Members is valuable data in the digital advertising-related market for consumer information.

36. At no point did Plaintiff or the Class Members consent to Defendant's disclosure of their video viewing history to third parties. As such, Defendant deprived Plaintiff and the Class Members of their privacy rights and control over their personal information.

37. The harms described above are aggravated by Defendant's continued retention

9

and commercial use of Plaintiff's and the Class Members' personal information, including their private video viewing histories.

## CLASS ACTION ALLEGATIONS

38. Plaintiff brings this action on behalf of herself and all other similarly situated individuals pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(3). Specifically, the Class is defined as:

> All persons in the United States who, during the maximum period of time permitted by law, logged in to Defendant's Website or Apps and viewed prerecorded content or purchased audio visual materials using their mobile or computer browsers.

39. The Class does not include (1) Defendant, its officers, and/or its directors; or (2) the Judge to whom this case is assigned and the Judge's staff.

40. Plaintiff reserves the right to amend the above class definition and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

41. *Community of Interest*: There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

42. *Numerosity*: While the exact number of members of the Class is unknown to Plaintiff at this time and can only be determined by appropriate discovery, upon information and belief, members of the Class number in the millions. Members of the Class may also be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

43. *Existence and predominance of common questions of law and fact*: Common questions of law and fact exist as to all members of the Class and predominate over any

questions affecting only individuals of the Class. These common legal and factual questions include, but are not limited to:

(a) Whether Defendant collected Plaintiff's and the Class Members' PII;

(b) Whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA;

(c) Whether Defendant's disclosures were committed knowingly; and

(d) Whether Defendant disclosed Plaintiff's and the Class Members' PII without consent.

44. *Typicality:* Plaintiff's claims are typical of those of the Classes because Plaintiff, like all members of the Classes, requested and watched videos on Defendant's Website and had his PII collected and disclosed by Defendant to third parties.

45. *Adequacy*: Plaintiff will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an adequate representative of the Class because he has no interests which are adverse to the interests of the members of the Class. Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained skilled and experienced counsel.

46. Moreover, the proposed Classes can be maintained because they satisfy both Rule 23(a) and 23(b)(3) because questions of law or fact common to the Classes predominate over any questions affecting only individual members and a Class Action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a) The expense and burden of individual litigation makes it economically unfeasible for members of the Classes to seek to redress their claims other than through the procedure of a

11

class action;

(b)     If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members of the Class to seek to redress their claims other than through the procedure of a class action; and

(c)     Absent a class action, Defendant likely will retain the benefits of its wrongdoing, and there would be a failure of justice.

## CAUSES OF ACTION

### COUNT I
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710, *et seq.*

47.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

48.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifiable information" concerning any "consumer" to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

49.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of selling and delivering audiovisual materials—including the prerecorded videos that Plaintiff and the Class Members requested and viewed on the Website and Apps—and those deliveries affect interstate or foreign commerce.

50.     As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser,

or subscriber of goods or services from a video tape service provider." Plaintiff and the Class Members are "consumers" because they subscribed to Defendant's Website and Apps, which provides video content to users, or they purchased audiovisual content from Defendant. In so doing, Plaintiff and the Class Members either entered their email and subscribed to Defendant's newsletter, or created an account on Defendant's Website and Apps and provided Defendant, at a minimum, their names, emails, addresses, credit card information, and other persistent cookies containing their PII, including the title of the videos they requested and/or viewed.

51. Defendant knowingly caused Plaintiff's and the Class Members' Personal Viewing Information, as well as the above-referenced unique identifiers, to be disclosed to third parties, including Facebook and TikTok. This information constitutes "personally identifiable information" under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member to third parties as individuals who either (a) viewed Defendant's video content, including the specific prerecorded video materials requested and/or viewed on the Website and Apps; or (b) purchased audiovisual materials in the form of DVDs and video games from Defendant. This information allowed third parties, such as Facebook and TikTok, to identify Plaintiff's and each Class Members' specific video viewing preferences and habits.

52. As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer;" and (2) "at the election of the consumer…is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent from Plaintiff and the Class Members under this definition.

53. Defendant was aware that the disclosures to third parties that it shared through the

tracking software that it incorporated in its Website and Apps identified Plaintiff and the Class Members. Indeed, both Facebook and TikTok publicly tout their abilities to connect PII to individual user profiles. Defendant also knew that Plaintiff's and the Class Members' Personal Viewing Information was disclosed to third parties because Defendant programmed the tracking software into the Website's and Apps' code so that third parties would receive the video titles and subscriber's unique third-party identifiers when a subscriber requested and/or viewed a prerecorded video on the Website or Apps. The purpose of those trackers was to obtain identifiable analytics and intelligence for Defendant about its user base, while also benefiting Facebook and TikTok, among other third parties, by providing them with additional data that they can leverage for their advertising, analytics and/or other services.

54. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, the Website's and app's disclosures to Facebook and TikTok were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

55. On behalf of herself and the Class Members, Plaintiff seeks declaratory relief, statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c), and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiff as representative of the Class; and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendant's conduct violates the statute referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(c)     For compensatory, statutory and punitive damages in amounts to be determined by the Court and/or jury;

(d)     For prejudgment interest on all amounts awarded;

(e)     For an order of restitution and all other forms of equitable monetary relief; and

(f)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated:  January 14, 2025                    Respectfully submitted,

By:     /s/ Mark C. Atlee

Mark C. Atlee, Esquire
mcatlee@atleehall.com
**ATLEE HALL, LLP**
415 North Duke Street
Lancaster, PA 17602
(717) 393-9596
(717) 393-2138 (facsimile)

**BURSOR & FISHER, P.A**.
Alec M. Leslie
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646)-837-7150
Facsimile: (212) 989-9163
Email: aleslie@bursor.com

**GUCOVSCHI ROZENSHTEYN, PLLC.**
Adrian Gucovschi (*pro hac vice* forthcoming)
Nathaniel Haim Sari (*pro hac vice* forthcoming)
140 Broadway, FL 46
New York, NY 10005
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gr-firm.com
            nsari@gr-firm.com

*Attorneys for Plaintiff and the Putative Class*